IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Cause No.: 4:25-cr-00260-ZMB-SPM |
| | ) | |
| ALBERT JAMES, | ) | |
| | ) | |
| Defendant. | ) | |

POST-HEARING BRIEFING IN SUPPORT OF DEFENDANT'S MOTIONS TO SUPPRESS EVIDENCE AND STATEMENTS (R. DOCS. 20 & 21)

I.      **The traffic stop was unconstitutionally prolonged by English to allow for a canine search.**

*""At approximately 10:41 hours I handed James his documents back. I shook James' hand and told him to be safe." (Tr. 72:9-10)*

When English handed James' documents back to him and shook his hand this traffic stop was legally concluded. Even English says that at that point "I'm concluding the stop. I hand him his warning and shake his hand." (Tr. 29:22-23). The Government asked, "So the business of the traffic stop at that moment has concluded?" (Tr. 29:24-25).  To which, English responds "Yes." (Tr. 30:1; see also Tr. 71:1-13). This is dispositive.

Everything that happened after the handshake was an unconstitutional

1

extension of the traffic stop which was impermissibly done with the sole intention of elongating time to allow for an open-air sniff by the canine (who had just arrived on scene). The instant the above quote was uttered by English, Mr. James should have been allowed to return to his vehicle and drive away. Instead, with no newly developed information to justify a prolonged stop, English illegally detained James to allow for a now unconstitutional search.

The law on this question is clear and well settled. "A lawfully-initiated traffic stop can become unlawful if it is unreasonably extended." *United States v. Callison*, 2 F.4th 1128, 1131 (8th Cir. 2021). "Generally, a stop should last no longer than is necessary to confirm or dispel the officer's suspicions." *United States v. Long*, 532 F.3d 791, 795 (8th Cir. 2008); see also *Rodriguez v. United States*, 575 U.S. 348, 350 (2015) ("[A] police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures.").

The only possible salvation for the Government is to allege that in the moments after handing James back his documents English somehow developed additional information which would justify an extension of the traffic stop ("an officer may extend the traffic stop if he develops reasonable suspicion of additional criminal activity." *United States v. Virrueta*, 121 F.4th 706, 710 (8th Cir. 2024); see also *United States v. Gastelum*, 11 F.4th 898, 902 (8th Cir. 2021) ("An officer's suspicion of criminal activity may reasonably grow over the course of a traffic stop as the circumstances unfold and more

2

suspicious facts are uncovered." (quoting *United States v. Magallon*, 984 F.3d 1263, 1278 (8th Cir. 2021))).

However, the record in this case does not support this. The only development in the interaction between English and the Defendant after the handshake was that the Defendant declined a request to search his car (which is of course totally reasonable and constitutional, and which may not form the basis to detain someone). (Tr. 30:4-19). No new facts were developed by English. No new information was uncovered by English. At the time he detained the Defendant, English was in possession of the same facts and information that he was seconds before when he "concluded the business of the traffic stop." The ONLY development after handing James back his documents and telling him to be safe was the arrival of the canine officer on the scene and James declining a consent search (which, again, is his constitutional right).[1] That does not support the type of "additional information" which could justify prolonging the traffic stop. All the behavior which English testified to at the hearing as being suspicious occurred BEFORE English shook his hand and

---

[1] We know this is the timing of events as the canine officer testified that "basically as soon as I got there, Agent English, Mr. James got out of the vehicle, and then I got out of my vehicle just to see what they were talking about and that was it." (Tr. 89: 19-23).

3

concluded the traffic stop.[2]

Accordingly, the traffic stop in this case was illegally and unconstitutionally prolonged thereby violating James' rights under the Fourth Amendment. The evidence seized in the subsequent search and any statements by James must be suppressed.

II.   **<u>The government failed to sufficiently establish the qualifications of the canine or its handler and there is not an adequate foundation to establish the canine or handler were qualified to conduct the open-air sniff or that the sniff was reliable.</u>**

While the illegal prolonging of the traffic stop is dispositive on the question of suppression, an alternative and equally strong grounds of suppression is the Government's failure to satisfy its burden to establish the qualifications and reliability of the canine and handler.

The test for determining whether a drug dog's alert is sufficiently

---

[2] English testified to "controlling the conversation" (Tr. 17), nervous touching behavior (Tr. 18: 5-8, 22:7), believing the origin and destination cities were drug source travel (Tr. 21:13-24), suspicions regarding the nature of the rental contract (Tr. 24:3-25, 25:1-23), suspicions regarding the details of his trip (Tr. 26:3-17, 27:10-20), being nervous (Tr. 27:21-22), apparent contradictions about his travel (Tr. 28:21-24). See also Tr. 66 to 70. See also Tr. 78:23 to 79:2).

reliable to establish probable cause for a search warrant is "whether all the facts surrounding the dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime." *United States v. Jackson*, 811 F.3d 1049, 1052 (8th Cir. 2016) (quoting *Florida v. Harris*, 133 S. Ct. 1050, 1058 (2013)). The Supreme Court has held that "evidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert." *Harris*, 133 S. Ct. at 1057.

If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search. The same is true, even in the absence of formal certification, if the dog has recently and successfully completed a training program that evaluated his proficiency in locating drugs. *Harris*, 568 U.S. at 246–47, 133 S.Ct. 1050. "This presumption may be overcome if a defendant can show, either through cross-examination or introducing his own fact or expert witness, the inadequacy of a certification or training program or that the circumstances surrounding a canine alert undermined the case for probable cause." *Gonzalez*, 781 F.3d at 429.

The testimony of the canine officer at the hearing was insufficient to establish the adequacy of any training program or certification. The handler

5

testified that *he* was CLEET-certified. (Tr. 85:22-23).[3] He also testified he was a certified dog handler (Tr. 86:1-2). The canine officer testified he has "to be CLEET certified [as a] K-9 team. The dog has to be certified as well." (Tr. 86:9-12). There was no testimony regarding whether the CLEET certification (or whoever provided the certification, as that is actually unclear) is a bona fide canine training organization, is approved to certify dogs and handlers, or whether after the testing is done in a controlled setting or reliable. The witness testified that he has "hours of training…and then you get a certified cerifier to certify you as state approved." (Tr. 86: 12-14). As far as the dog's training he testified that "they will lay out hides and then [the dog] will find them. And I will say 'we found it,' and he will say, 'good job.' And then they send off paperwork to our state." (Tr. 86:15-19). On cross-examination the officer testified there is annual certification but was silent as to who conducted it or whether those certifications are industry standard or approved. (Tr. 99:4-14). There was no evidence that the certification was current or is widely accepted in the field. There was no testimony regarding the performance of the canine

---

[3] While not established by the government at the hearing, CLEET certification presumably refers to credentials issued by the Oklahoma Council on Law Enforcement Education and Training. It is the mandatory licensing and training standard in Oklahoma for peace officers, private security guards, private investigators, and bail enforcers.

or the handler during this training. There was no evidence they both passed the first time or repeatedly failed examinations. The officer's testimony was insufficient to establish the sufficiency of his training or the dog's training or the pair's reliability.

Training records can also be offered in support of the reliability of a narcotics detection canine, but "must contain sufficient information to permit a Court to determine said canine's reliability in detecting narcotics." See, gen., *Florida v. Harris,* 565 U.S. 237, 247–50 (2013).

Defendant's **Exhibit B** represents the totality of the certification and training documents for the canine and its handler which were produced by the United States.[4] The canine-related document production has no records to confirm that either the canine or its handler were actually certified at the time of the traffic stop or that any certification they might have received was industry accepted or reliable. The production had no records documenting any continuing education by either the handler or the canine (or the dates of such

---

[4] The day of the hearing counsel was provided a supplemental deployment report related to this particular traffic stop. (Tr. 96:9-22). Exhibit B contained no other deployment reports from any other stops, despite the fact that the canine officer testified that they document ALL K-9 deployments. (Tr. 97:2-12). So, presumably there are additional records related to this canine, they just were not produced.

7

classes). The document production had no deployment records which might allow a party to evaluate the accuracy of the canine. The logs which were produced were barely filled out and all but useless in determining the ability of the canine or the handler to perform their function. (See examination on **Exhibit B**, Tr. 101 through 122 – some forms didn't have handlers listed, some didn't have the dog listed, most were completely devoid of any useful detail.) There was never even enough information provided by the government to merit a third-party review by the defense – there were no substantive certifications or records to review.

The government failed to establish a foundation that either the canine or its handler was properly certified, trained, or reliable. Accordingly, the open-air sniff cannot be validated, and the evidence must be suppressed.

III.     The proffered basis for the initial traffic stop is dubious, and English has so little credibility, that it should be determined to be unlawful.

While it is almost a certainty that the Defendant was pulled over as pretext for English to perform a drug investigation, Defendant acknowledges that "[c]ourts are not to consider the motive for a stop as long as the reason for the stop is valid." *United States v. Jones*, 275 F.3d 673, 680 (8th Cir. 2001) (citing *Whren v. United States*, 517 U.S. 806, 813 (1996). The problem in this case is that no matter how pretextual the stop was, English failed to establish that his proffered reason for the traffic stop was valid or legal.

As a grounds for the pretextual stop English cited "following too closely" in violation of Oklahoma law.[5] English testified that he was able to determine that James' vehicle was too close to the vehicle in front of him by using the dashed lines on the highway. The in-car dash cam video of the encounter is not obvious on this point, which leads us to have to rely on English's credibility regarding what he actually observed and cited as the legal reason for the traffic stop.[6] That presents several problems: (1) The method English used to measure whether the vehicles were too close is at best suspect; (2) English is unable to sufficiently legitimize the manner in which he actually observed the alleged offense; and (2) English himself has so little credibility that anything he says MUST have extrinsic support to be given any weight at all.

### a. Foundational problems with the "dotted line" method.

As an initial matter, foundationally, the Government offered no evidence or support that the dashed-line-observation method supposedly utilized by English is a reliable method of determining whether a vehicle is following another too closely. This is because the Government offered no evidence that using lane markings is an approved method for determining time headway violations (which is the industry name for "following too closely").

---

[5] Oklahoma Statutes §47-11-310.

[6] See Tr.56:11-16 where English states that he cannot identify where on the video the traffic violation occurred.

Visual observation of the "dotted line method" lacks any demonstrable scientific reliability. Time headway is not a directly observable quantity; it is defined as "the elapsed time between the arrival of the lead vehicle and the following vehicle at a designated test point."[7]   Determining time headway therefore requires identifying a common roadway reference point and measuring the time required for the following vehicle to reach that same point after the lead vehicle passes it.[8] Nothing in the U.S. Department of Transportation Manual on Uniform Traffic Control Devices (MUTCD) identifies lane markings as a device or method for measuring time headway.[9] Instead, the MUTCD describes longitudinal pavement markings as devices that delineate traffic flow, lane separation, restrictions, permissive conditions, or warnings about downstream lane-function changes.[10] These markings are

---

[7] Mei Zhu et al., Car-Following Headways in Different Driving Situations: A Naturalistic Driving Study, CICTP 2016, at 1419: "Headway is defined as: the elapsed time between the arrival of the lead vehicle (LV) and the following vehicle (FV) at a designated test point."

[8] *Id.*; see also FHWA, Traffic Flow Theory: Traffic Stream Characteristics, Ch. 2, identifying time headway as a measured traffic-flow variable.

[9] FHWA, MUTCD § 3A.06, describing functions, widths, and patterns of longitudinal pavement markings.

[10] *Id.* § 3A.05–3A.06: white longitudinal markings delineate same-direction

designed for lane delineation, not as measurement devices for determining traffic violations. The "dotted line method" therefore appears to lack any established foundation as a validated measurement method for determining sub-second headway (as opposed to visually observing someone run a stop sign, or a radar gun measuring speed, etc.)

At 70 miles per hour, a vehicle travels approximately 103 feet per second. Thus, the difference between a one-second headway and a 1.2-second headway is only about 20 feet—roughly one-half of a standard lane-marking cycle. To conclude that a vehicle was traveling "less than one second" behind another vehicle, under the best circumstances an officer would have to distinguish among moving vehicles separated by only a fraction of a second while simultaneously observing from a moving patrol vehicle.

### b.  Problems specific to English's observations.

Beyond the methodological problems, English was unable at the hearing to reliably establish much of the detail he supposedly relied on in making his determination of "following too closely."  First, English was so far from the subject cars when he was making these measurements that he could not even

---

traffic flow or right-hand roadway edge; broken lines indicate permissive conditions; dotted lines provide guidance or warning of downstream lane-function changes.

11

determine how many occupants were in the car. (Tr. 79:13-15). So…by his own admission he is making these observations at a distance. (see also Tr. 57:14-15) Then, English did not know how fast he was traveling (Tr. 57:16-17) nor how fast either of the vehicles he was attempting to measure were traveling (Tr. 57:18-22; 61:8-11). And this is not an observation that is being made from a stationary vehicle…English is attempting to make this observation while himself moving, linearly at a distance <u>behind</u> these other vehicles by necessarily picking a dashed line somewhere in front of the lead vehicle, noting when the lead vehicle passes the line, simultaneously tracking the following vehicle, and gauging when the subject vehicle then crosses that line (all while operating his own vehicle in a safe manner).

Anecdotally, I have also been driving for 30+ years and have found it extremely difficult to make a similar observation in my recent highway experiments. The Court should try this one day: pick a car far enough ahead of you on the highway that you cannot reliably state how many people are occupying it. Then pick a vehicle ahead of *that*. Then while you are traveling at 70mph in an adjoining lane pick a dotted line in front of the lead vehicle, stay focused on that white line (while you are continuing to safely operate your vehicle at speed on the highway) and reliably measure the time it takes the lead vehicle to pass that mark, and then the subject vehicle to then encounter that dotted line (the witness never said whether it was the front of the line or

12

the back of the line he was observing…which probably makes a difference).[11] As the Court will see…there are so many moving parts in an observation like this that make it understandable why this is not a reliable methodology for determining whether two vehicles are following too closely.

While a pretextual stop is legally allowed, the stop still needs to be legitimate and the officer needs to be able to articulate its legitimacy. This, however, even by English's telling is a subjective measurement. (Tr. 60:14-16), And, with a suspect methodology to support the stop, necessarily dependent on subjective interpretation, we are therefore required to depend on the credibility of the officer, who in this case has ZERO credibility as he has repeatedly decided to lie to his own department when he believed it would benefit him. At the risk of beating a dead horse, the extent of English's inability to tell the truth even came through in the hearing where he initially characterizes his wild night as occurring at a "concert" (Tr. 36:20), requiring defense counsel to clarify that it was a "rave." (Tr. 45:3-6).[12] English characterized his departure

---

[11] English's method is set out on Tr. 59 where he statues "I would be able to see, you know, that the rear bumper of the front vehicle passed the hashmark, and I would count out audibly 1,001 and then the front bumper of his vehicle hit that…that hashmark that I signaled, and it was less than a second for me to count out loud…." (Tr. 59:4-10).

[12] An important distinction because "a rave concert, which is a known

from the rave as "after leaving the venue" (Tr. 36:21) omitting that he had been ejected by security (Tr. 45:14-15). English said he was given the option to retire early (Tr.38:10-11) when in fact that was a half truth as his retirement was in lieu of termination (Tr. 43:14-19). And, while he testified that he does not subjectively believe he was untruthful with his Department (Tr. 37:14-16) the Oklahoma Bureau of Narcotics found his "false statements, either intentional or from a high level of intoxication, during the night in question, during *Garrity* interviews is problematic and causes potential Brady/Giglio issues as a core job function." See **Exhibit C** and Tr. 46:23 to 47:8). Notably these untruths, half-truths, and misleading answers were testified to at the May 2026 evidentiary hearing – not "in the moment" back in his troubles. Years later and he still cannot be honest about what happened. This witness simply cannot be candid or truthful and any question that even touches on his credibility must be resolved in favor of the Defendant.

English was unable to legitimize the traffic stop because it was not legitimate. English picked a random pretextual basis for a traffic stop that he never thought he would have to explain or justify, which is why he is unable to credibly explain or support it. Beyond merely being pretextual (which is

environment where consumption of illicit substances such as ecstasy and MDMA occur, could damage the public's respect for O.B.N." (Exhibit B, p. GOV_000122).

14

allowed) the proffered basis for the stop is fictional. There was no evidence that the Defendant was following someone too closely and there was no probable cause to pull over the Defendant's vehicle. The traffic stop was illegal, and all evidence and statements later obtained by law enforcement should be suppressed.

### IV.    *United States v. John Anthony Davis*, 2022 WL 1410717

The District Court of Minnesota (also within the 8th Circuit) recently considered a similar fact pattern plagued by many of the same issues present in this case. *Davis* includes a very relevant discussion regarding the illegal extension of a traffic stop as well as the Government's obligation to establish the reliability of the canine and handler. A copy of that opinion is attached to this memorandum for the Court's consideration.

### CONCLUSION

There are three independently compelling reasons to suppress the evidence and statements in this case. While all three apply, any one of them would be independently legally sufficient for suppression. The traffic stop in this matter was made without probable cause. The traffic stop was illegally and unconstitutionally extended. And the Government failed to establish that the canine/handler team were sufficiently trained or reliable. Both the drug evidence and the statement of defendant must be suppressed.

Respectfully submitted,

**NEWTON BARTH, L.L.P.**

By:   */s/ Talmage E. Newton IV*
       Talmage E. Newton IV, MO56647
       talmage@newtonbarth.com
       555 Washington Ave., Suite 420
       St. Louis, Missouri 63101
       (314) 272-4490 – Telephone
       (314) 762-6710 – Fax

       *Attorney for Defendant James*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing was electronically served on all parties of record and filed with the court via the court's e-filing system on this 2nd day of June 2026.

*/s/ T.E. Newton*