**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:25-CR-260-ZMB-SPM |
| | ) | |
| ALBERT JAMES, | ) | |
| | ) | |
| Defendant. | ) | |

# REPORT AND RECOMMENDATION AND MEMORANDUM OPINION OF UNITED STATES MAGISTRATE JUDGE

All pretrial matters in this case were referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b). Currently before the Court is Defendant Albert James's ("Defendant" or "James") Motion to Suppress Physical Evidence (ECF No. 20) and Motion to Suppress Statements (ECF No. 21). The United States is contesting both motions. *See* ECF No. 25. James contends drugs seized by police from his rental car on April 15, 2021, must be suppressed as the fruit of an unconstitutional traffic stop and search of the rental car. *See* ECF. No. 20, at 1. James also contends that any statements he made to law enforcement following his illegal detention should be suppressed because they were obtained in violation and because they were the fruit of the illegal traffic stop and search. *See* ECF. No. 21, at 1-2. The undersigned has carefully considered the evidence presented, the applicable law, and the arguments of both parties. For the reasons discussed below, the undersigned finds, and respectfully recommends, that both motions be denied.

## BACKGROUND AND PROCEDURAL HISTORY

On May 14, 2025, a federal grand returned an indictment charging James with two counts of knowingly and intentionally possessing with intent to distribute, methamphetamine and fentanyl. ECF No. 2. The drugs with which James is charged were seized during a traffic stop initiated by Officer Kyle English in Oklahoma on April 15, 2021. *See id.* James was arraigned on May 16, 2025, and made an oral motion for time to file pretrial motions. On May 19, 2025, the undersigned entered an order setting an initial deadline for filing pretrial motions of June 16, 2025. ECF No. 15. On June 16, 2025, in compliance with the Court's scheduling order, James filed a Motion to Suppress Physical Evidence, ECF No. 20, and Motion to Suppress Statements, ECF No. 21. On July 7, 2025, consistent with deadlines imposed by the Court, the United States filed its response to both suppression motions. ECF No 25.

Although the Court scheduled an evidentiary hearing for August 13, 2025, *see* ECF No. 22, on August 11, 2025, the United States requested a continuance of the evidentiary hearing so that the Assistant United States Attorney could obtain information from the Oklahoma Bureau of Narcotics ("OBN") about the circumstances surrounding the termination of the United States' primary witness for the evidentiary hearing—Officer Kyle English ("Officer English"). *See* ECF No. 27. The Court granted the requested continuance and, subsequently, on September 2, 2025, the Court entered an order granting Defendant's request at a case status hearing to defer re-scheduling the evidentiary hearing until Defendant had an opportunity to review and respond (including potentially with additional pretrial motions) to documents recently disclosed by the United States from OBN regarding Officer English. *See* ECF No. 38.

On September 12, 2025, James filed a sealed motion to compel disclosures of Officer English's disciplinary and personnel records from OBN. ECF No. 40. From September 12, 2025,

through October 24, 2025, the parties litigated James's motion to compel. *See* ECF Nos. 54, 55, 56 and 57. After the motion to compel was resolved, the undersigned scheduled an evidentiary hearing on James's pending suppression motions for January 9, 2026. ECF No. 59. However, the parties litigated the issue of whether Officer English should be permitted to testify remotely and, at the request of the defendant, the hearing was continued multiple times to May 5, 2026. *See* ECF. Nos. 68, 70, 71, 72 & 74.

On May 5, 2026, the parties appeared for an evidentiary hearing. At the hearing, the United States called two witnesses to testify: Officer English and Matthew Clement, an OBN police officer and certified dog handler ("Officer Clement"). The Court also admitted six exhibits offered by the United States: Govt. Exhs. 1, 2, 2A, 5X, 5Y and 6. *See* Hearing Tr. (ECF No. 87), at 130. James did not call any additional witnesses but relied on cross-examination testimony from the United States' witnesses and offered four exhibits into evidence: Deft. Exhs. B, C, D and E. *See id.* At the end of the hearing, the parties requested, and were granted, time to file post hearing briefs. Post hearing briefing was completed on July 13, 2026.

Based on Officer English's hearing testimony, James was granted leave to reopen issues raised in his earlier motion requesting disclosure of English's personnel records. On June 2, 2026, James filed a supplemental motion for discovery, *see* ECF No. 88, and on August 31, 2026, the undersigned entered an order directing the United States to submit certain personnel records for an *in camera review* by the Court. ECF No. 103. The undersigned completed its *in camera review* and entered an order ruling on James's supplemental motion to compel discovery on November 2, 2026. The matters raised by James's suppression motions, including the question of whether Officer English's personnel records included information subject to disclosure under *Giglio* have now been fully briefed and James's suppression motions are now ready for a ruling.

## FACTUAL FINDINGS

Although the undersigned considered all evidence presented at the evidentiary hearing, these factual findings are based primarily on the hearing testimony of Officers English and Clement, whose testimony the undersigned found to be largely supported by the video evidence and other evidence of record; the video recording of the traffic stop (Govt. Exh. 6); the unofficial transcript from the stop (Govt. Exh. 2a); and the K-9 training log and related documents (Deft. Exh. B).

### A. Officer English

As of April 15, 2021, Officer English had been an OBN officer for approximately ten years and was working as a member of the OBN K-9 Highway Interdiction Team. His primary duties involved patrolling interstates to do criminal interdiction with an emphasis on drug interdiction. His training included learning how to conduct roadside interviews and how to detect criminal behavior by listening to how people answer questions and being attuned to how people behave when they have been pulled over for various traffic violations. He testified that he was trained to assess if people he encounters are "involved in more than just a normal motoring public." Tr. (ECF No. 87), at 9. Officer English primarily worked along the highways in Canadian County, which is a rural county just outside of Oklahoma City. He explained that area of Canadian County, along Interstate 40 ("I-40"), was "a common corridor for drugs coming from the south and west, traveling east throughout the United States." *Id.*

While patrolling this stretch of I-40 on April 15, 2021, Officer English observed a white SUV traveling eastbound behind another vehicle at what he considered to be an unsafe following distance. In the officer's estimation, the white SUV was traveling less than three seconds behind the vehicle in front of it in violation of the recommended distance in the Oklahoma driver's

manual. From his vantage point, Officer English could not tell if the SUV was speeding and could not tell the age, race, or gender of the driver. Officer English initiated a traffic stop of the white SUV and a camera on his police car recorded the stop. The camera began video recording once Officer English activated his siren and, after about a thirty second lag, audio recording of the traffic stop began. *See* Govt. Exh. 6.

James was the only person in the white SUV. Officer English advised James the reason for the stop and requested James' license and insurance. James handed English his Missouri issued driver's license and a rental agreement for the SUV. Officer English noticed that, based on the rental agreement, the SUV had been rented in Phoenix, Arizona three days earlier on April 12, 2021, and was due back on the day of the stop (April 15th) in Phoenix, which is nearly 1,000 miles ***west*** of where James (who was headed ***eastbound***) was stopped. Officer English told James that he would issue him a warning for the traffic violation and asked James to join him in his police car. Officer English admitted that, as part of his training, he will routinely have people sit next to him during a traffic stop both for officer safety (he can "see them versus them being up in a vehicle where [he] can't see what they're doing") and "to be able to talk to them about their travel plans and ascertain if it's somebody that's involved in . . . normal motoring business on the interstates or if they are involved in any type of criminal activity." Tr. (ECF No. 87), at 6.

James joined Officer English in his police car and, as Officer English began writing up the warning, James talked, unprompted, about extra fees the rental company was trying to charge him for converting his roundtrip rental into a one-way rental that would allow him to drop the car off in St. Louis instead of returning it to Phoenix. A little more than 9 minutes elapsed between the time James first entered the police car and Officer English printed out the warning and handed it to James. *See* Govt. Ex. 6, at 02:39-11:55. Officer English testified that, based on his

training, it appeared that James was trying to control the conversation to prevent Officer English from asking about his travel plans. Officer English also testified that, based on his training and experience, he understood Phoenix to be a well-known drug origin city because of its proximity of the border. English further testified that, based on that training and experience, James appeared to display greater than normal nervousness whenever English asked him about where he was headed and where he was coming from (e.g., rubbing and scratching the back of his head, yawning, filling gaps of silence, etc.). Officer English testified that this conduct raised suspicion that something criminal might be afoot.

In addition to James's nervous behavior, James's explanation for why he wanted to convert the rental into a one-way rental despite the high cost also caused Officer English's suspicions to grow. James offered that he went to Phoenix to help his uncle with a business of his but then was very vague in response to follow up questions by English about the nature of his uncle's business and the specific ways James went to help his uncle. English found the vague responses suspicious particularly when contrasted to the very detailed information James had just shared about his discussions with the rental car company. Officer English's suspicion grew even more when James offered that he was in the area looking at real estate as another possible reason why he was on this trip and then pivoted to saying he was thinking about stopping to see his sister in Kansas City even though he had not mentioned Kansas City when Officer English asked him what his destination was. Officer English's suspicion grew deeper still when James stated that he had already talked to his sister and would be going to Kansas City, even though at the outset of the stop James stated he was going to St. Louis, and then one minute before stating he was going to Kansas City, James told English he was ***thinking*** about going to see his sister in Kansas City. Finally, in response to pointed questions by Officer English about James's statement

that he had driven through the night, James deflected by asking English questions about his family. Based on his training, Officer English construed these inconsistencies and deflection by James as an attempt by James to both evade and "sell" a story of the legitimacy of his trip and explain why he was driving a one-way rental from Phoenix to St. Louis versus pursuing the less costly option of flying back to St. Louis from Phoenix.

Approximately 9 minutes after James and English entered the police car, English handed James the warning, shook his hand, and told him to "be safe" signaling that the business related to the traffic stop was over. *See* Govt. Exh. 6, at 11:55. Officer English then asked James if he could ask him a few more questions and James responded in the affirmative. English asked James if he had anything illegal in the vehicle, like drugs or weapons; James said no. English asked if everything in the vehicle belonged to James; James said yes. English asked James for consent to search the vehicle and consent to run a drug dog which had arrived on scene, and James said no. At that point, approximately 12:50 minutes into the recording of the traffic stop, Officer English told James (who was heading back to his rental car) that he was being detained and directed James to take a seat in the back seat of the police car. *Id.* James complied with the request but indicated that he wanted to get his phone from the SUV. At about 13:23 minutes into the recording, Officer English asked James if he wanted him to grab his phone "now" or after they ran the drug dog. *Id.* James stated he wanted his phone "now" and Officer English went to the SUV to retrieve the phone after confirming it was in the center console. *Id.*

At 13:35 minutes into the recording, Officer English opened the driver's side door and appears to search briefly for James's phone before returning to the police car at 14:09, and reporting to James that he didn't have the phone because it wasn't "sitting right there" and he did not want to "dig in [James's] stuff." *Id.* At approximately 14:14 minutes into the recording,

Officer Clement and his canine begin to conduct an open-air sniff of the white SUV. *Id.* Officer English testified that the dog alerted, and the officers found contraband in the doors of the rental car.

After they found the drugs, English asked James if he wanted to talk about what they had found but James stated he did not want to talk at all or cooperate.[1] The officers continued their search of the car and found bundles of cellophane in the door and, after a field test, one of the bundles was positive for the presence of methamphetamine. After the field test, English formally placed James under arrest.

### B. Officer Clement

At the time of the evidentiary hearing, Officer Clement was a twelve-year veteran OBN police officer. Officer Clement had been a certified dog handler since 2020. He explained that the certification program required that the handler and the dog get certified as a "certified K-9 team" after hours of training. Tr. (ECF No. 87), at 86. Officer Clement testified that, as a canine doing narcotics detection, Trick (and her handler) undergo annual recertifications. According to Officer Clement, Trick was trained to detect cocaine, methamphetamine, heroin, and marijuana. Training records, introduced into evidence by defendant, partially corroborated that testimony. Although Officer Clement was not explicitly asked if his canine "Trick" was certified on the day of the stop—April 15, 2021—the undersigned infers from the testimony that on April 15, 2021, Officer Clement and his canine "Trick" were working as a certified K-9 team for the Oklahoma Bureau

---

[1] Both parties indicated that at some point after he was detained, James exclaimed to himself while inside the police vehicle "Damn, I', f*cked." *See* USA Brief in Opp. To Deft's Motion to Suppress Statements, ECF No. 25, at 5. *See also* Tr. (ECF No. 87), at 132, where in response to the Court's question "what statements is Mr. James asking be suppressed?" defense counsel answered "there is a video portion where Mr. James is in the back of Mr. English's patrol car and says something along the lines of "I'm effed" to himself while he's sitting there.").

of Narcotics, narcotics interdiction team. *See id.* at 86 & 102-106 (discussing the recertification process and K-9 training logs (Deft. Exh. B). Officer Clement testified that although a drug dog like Trick could theoretically have a false positive alert or false negative, that had "never happened" with Trick, to his knowledge. *Id.* at 107. He testified "[t]o the best of my knowledge, she's the best dog in the state." *Id.* at 108.

As of April 2021, Officer Clement and Trick worked together for approximately a year and a half. He testified that he and Trick were together twenty-four hours and day, and he was very familiar with her. Officer Clement testified he arrived at James's traffic stop approximately 12:24 minutes into the video recording of the traffic stop. He was not called to the scene but believed he saw that English was on a traffic stop and pulled up behind him in case he needed anything.

Almost as soon as Officer Clement arrived, he saw James and English get out of English's patrol car; so, he got out just to see what they were talking about. He observed Officer English direct James to get back in the police car and then English turned to him and told him to go get his dog. Officer Clement waited for approximately one minute as Officer English searched for James's phone and then when he saw English return to the police car with James and shut the door, he deployed Trick. Officer Clement testified that Trick got to work almost "right away" and based on her breathing and movements, Trick picked up the scent of narcotics and about 14:34 minutes into the video recording of the traffic stop, Trick gave her "final response" indicating to Officer Clement that she as "as close as [she was] going to get to the source" of the smell. Tr. (ECF No. 87), at 92-93.

Officer Clement testified that, based on Trick's reaction, he had no doubt that Trick was alerting them to the presence of narcotics in the car. After Trick alerted, Officers Clement and

English began their search of James's rental SUV which revealed that all four doors and the engine cavity were loaded with a crystal substance that field tested positive for methamphetamine. According to Officer Clement, Officer English transported James to the county jail, and he (Clement) stayed with the vehicle until the tow truck arrived to tow the car to the police warehouse where Clement further searched the vehicle.

### C. James's Statement

At some point after Officers Clement and English discovered drugs in the doors of the rental SUV, Officer English attempted to persuade James to cooperate with them, but James refused. After this exchange, an audio recording captured James's exclamation to himself while alone inside the police vehicle "Damn, I'm, f*cked." *See* Govt. Exh. 2a, line 225. It is this statement James seeks to suppress. *See* Tr. (ECF No. 87), at 132 (in response to the Court's question "what statements [sic] is Mr. James asking be suppressed?" defense counsel answered, "there is a video portion where Mr. James is in the back of Mr. English's patrol car and says something along the lines of "I'm effed" to himself while he's sitting there").

## CONCLUSIONS OF LAW

### I. Motion to Suppress Evidence (ECF No. 20)

James asserts that the drugs seized from his rental SUV on April 15, 2021, must be suppressed because the drugs were discovered as the result of an unlawful traffic stop, an unlawful extension of the stop to conduct a dog sniff, and a subsequent vehicle search that violated the Fourth Amendment. *See* ECF No. 20. The Fourth Amendment protects "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. As the Eighth Circuit has put it, "when a Fourth Amendment search is unreasonable, the exclusionary rule precludes evidence found during the search from being

admitted at trial. *United States v. Hadley,* 186 F.4th 563, 567 (8th Cir. 2026) (citing *Davis v. United States*, 564 U.S. 229, 231–32 (2011)). The exclusionary rule "is a prudential doctrine created by [the Supreme] Court to compel respect for the" rights the Fourth Amendment protects. *Id.* The rule is intended to "deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence." *Id.* (quoting *Herring v. United States*, 555 U.S. 135, 144 (2009)). The harsh sanction of exclusion is triggered by police practices that are "deliberate enough to yield meaningful deterrence, and culpable enough to be worth the price paid by the justice system." *Id.* (quoting *Davis*, 564 U.S. at 240). The exclusionary rule applies to verbal statements obtained as a result of official misconduct as well as to the more traditional seizure of physical evidence. *United States v. Yousif,* 308 F.3d 820, 832 (8th Cir. 2002) ("Verbal statements obtained as a result of a Fourth Amendment violation are as much subject to the exclusionary rule as are items of physical evidence discovered during an illegal search.").

In this case, James argues the drugs police seized from his rental SUV should be suppressed as the fruits of an unconstitutional search and seizure for at least three reasons. First, James asserts Officer English lacked probable cause to initiate the traffic stop and instead used the stop as a pretext for conducting a drug investigation. Next, James contends English lacked reasonable suspicion or probable cause to extend the traffic stop after he issued James a warning for the traffic violation. Finally, James posits that because the government failed to establish the qualifications of the canine or its handler, Officer Clement, it cannot rely on the canine alert to support the officers' search of the SUV.

### A. Officer English Did Not Violate The Fourth Amendment By Initiating A Traffic Stop of James's Rental SUV

Based on the foregoing factual findings, James's Fourth Amendment rights were first implicated when Officer English initiated his police lights and siren and James complied by

pulling over. It is well established that the "[t]emporary detention of individuals during [a traffic stop] by police, even if only for a brief period and for a limited purpose, constitutes a seizure of persons within the meaning of the Fourth Amendment." *United States v. Gunnell,* 775 F.3d 1079, 1083 (8th Cir. 2015) (internal quotation marks omitted) (quoting *Whren v. United States,* 517 U.S. 806, 809-10 (1996)). As such, a traffic stop is "subject to the constitutional imperative that it not be unreasonable under the circumstances." *Whren,* 517 U.S. at 810. Officer English testified he stopped James because, based on his observation and his understanding of the recommended distance in the Oklahoma Driver's Manual, James was following the car ahead of him at an unsafe distance, which is a violation of Oklahoma law. *See* 47 Okl. St. Ann. §11-310(a) ("The driver of a motor vehicle shall not follow another vehicle more closely than is reasonably prudent, having due regard for the speed of such vehicles and the traffic upon and the condition of the highway.").

James seems to suggest that the infraction—if one occurred at all—was so slight and so fleeting that a traffic stop based on Officer English's observations was unreasonable under the Fourth Amendment. However, the controlling law in this circuit makes clear that the decision to conduct a traffic stop is generally reasonable where the police have probable cause to believe that a traffic violation has occurred. *Gunnell,* 775 F.3d at 1083. Indeed, the Eighth Circuit has repeatedly held that "a traffic violation, no matter how minor, creates probable cause" for a traffic stop. *United States v. Ehrmann*, 421 F.3d 774, 780 (8th Cir. 2005); *see also United States v. Harris*, 617 F.3d 977, 979 (8th Cir. 2010) (applying rule to ordinance violation for excessive license plate tint); *United States v. Barragan,* 379 F.3d 524, 528 (8th Cir. 2004) (officer who testified to witnessing numerous violations including that the vehicle was following another vehicle too closely, had probable cause to stop the vehicle).

James also suggests the initial stop was constitutionally unreasonable because the reason Officer English gave for the stop was "a pretextual reason given by an officer whose primary focus was drug interdiction." ECF No. 20, at 9. However, "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." *Gunnell,* 775 F.3d at 1083. The Eighth Circuit has held that in determining whether police have violated the Fourth Amendment in conducting a traffic stop, "[c]ourts are not to consider the motive for a stop as long as the reason for the stop is valid." *United States v. Jones,* 275 F.3d 673, 680 (8th Cir. 2001) (citing *Whren,* 517 U.S. at 813) (holding that while it is decidedly constitutionally impermissible for police to decide which motorists to stop based on the race of a car's occupants, "the constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause, not the Fourth Amendment")). Even if James's skepticism about the reason for the stop was justifiable, because the evidence showed Officer English reasonably believed James violated Oklahoma traffic law, this Court cannot consider any ulterior motives the officer may have had when he decided to stop James for what appears to have been a minor traffic violation.

In sum, based on the record before the Court, including the dashcam video, it appears Officer English had probable cause to initiate the traffic stop for following too closely in violation of 47 Okl. St. Ann. §11-310(a). Although the infraction may have been minor and fleeting, the evidence demonstrated that Officer English had probable cause to effectuate the traffic stop.

### B. The Traffic Stop Was Not Unreasonably Prolonged

James next challenges the traffic stop on the ground that the stop was unreasonably prolonged. As the Eighth Circuit has held, "[a] traffic stop is a seizure within the meaning of the Fourth Amendment, and its tolerable duration is determined by the seizure's mission—to address the traffic violation that warranted the stop and attend to related safety concerns." *United States*

*v. Puckett,* 139 F.4th 730, 737 (8th Cir. 2025) (quoting *Rodriguez v. United States,* 575 U.S. 348, 354 (2015)). "Authority for a stop ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.* (quoting *Rodriguez*, 575 U.S. at 354). The Eighth Circuit has noted that although the "Supreme Court's Fourth Amendment jurisprudence tolerate[s] certain unrelated investigations that [do] not lengthen the roadside detention, a traffic stop can "become unlawful if it is prolonged beyond the time reasonably required to complete the mission of issuing a warning ticket." *Id.* As such, an officer may "conduct certain unrelated checks during an otherwise lawful traffic stop;" however, the officer "may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Id.* at 737-38. *See also United States v. Austin*, 104 F.4th 695, 699 (8th Cir. 2024) (holding, "A police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures. . . . and law enforcement must be reasonably diligent in carrying out that mission. Once an officer finishes the tasks associated with a traffic stop, it is unreasonable to further detain the vehicle's occupants unless something occurs during the stop to generate reasonable suspicion to justify the further detention").

In determining whether the requisite degree of suspicion exists to justify expanding a traffic stop, the court must determine whether the facts collectively establish reasonable suspicion and not whether each particular fact establishes reasonable suspicion; in other words, the whole picture, i.e., the "totality of the circumstances" must be taken into account. *See United States v. Linkous*, 285 F.3d 716, 720 (8th Cir. 2002); *United States v. Jones,* 269 F.3d 919, 927 (8th Cir. 2001). To avoid violating the Fourth Amendment, the officer's suspicion must be based upon "particularized, objective facts which, taken together with rational inferences from those

facts, reasonably warrant suspicion that a crime is being committed." *Jones,* 269 F.3d at 927 (quoting *United States v. Beck,* 140 F.3d 1129, 1136)) (8th Cir. 1998)).

Based on the factual findings and the video evidence, Officer English had twin goals when he asked James to join him in his police car as he prepared the warning: (i) officer safety and (ii) to investigate potential criminal activity by questioning James about his travel plans. The evidence shows that Officer English asked James travel-related questions while he conducted his records check and prepared the warning. Approximately 9 minutes after Officer English and James entered the police car, Officer English completed the tasks associated with the warning. At that point, the officer handed James the citation, shook his hand, and told him to be safe, indicating that the traffic stop itself was over. James does not contend the amount of time Officer English took to complete the tasks associated with the stop was unreasonable, or that Officer English unreasonably prolonged the stop by asking questions unrelated to the traffic violation. Indeed, the record would not support such an argument.

Instead, James argues the stop was unreasonably prolonged, first, because after clearly signaling that the traffic stop was over, Officer English unreasonably attempted to extend the stop and/or to buy time until the canine officer arrived by asking James to answer a few more questions and to consent to a search of the SUV. Second, James argues that Officer English's conduct—i.e., handing James the citation, shaking his hand, and suggesting that James was free to go—proves that, at 9 minutes into the traffic stop, nothing had occurred during the stop to generate reasonable suspicion to justify any further detention.

***1. Officer English did not violate the Fourth Amendment by asking James questions after he issued the warning***

James contends that, after he issued the warning, Officer English unlawfully prolonged the traffic stop by asking James to answer a few more questions and to consent to a search of the

SUV. However, the Eighth Circuit has held that "[n]ot all personal encounters between law enforcement officials and citizens fall within the ambit of the Fourth Amendment" and a consensual encounter between an officer and a private citizen does not implicate the Fourth Amendment." *Jones,* 269 F.3d at 925. Even if Officer English had no suspicion that James was engaged in criminal activity, "if the encounter after the completion of the traffic stop was consensual, then the Fourth Amendment would not prohibit [Officer English] from asking questions unrelated to the traffic stop, from seeking consent to search the truck, or even from asking if [James] would wait for the canine unit to arrive." *Id.; see also United States v. Campbell-Martin,* 17 F.4th 807, 814 (8th Cir. 2021) (holding that asking questions does not effect a seizure "as long as the police do not convey a message that compliance with their requests is required"). "A Fourth Amendment 'seizure' does not occur merely because a police officer requests permission to search an area or poses other questions to a citizen." *Jones,* 269 F.3d at 925 (quoting *United States v. White,* 81 F.3d 775, 779 (8th Cir. 1996)). "[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Id.* (quoting *United States v. Mendenhall,* 446 U.S. 544, 554 (1980)).

Based on the totality of the circumstances, James was seized for Fourth Amendment purposes until Officer English handed him the warning, shook his hand, and indicated by words and conduct that the traffic stop was completed. After English handed James the warning, nothing about his interaction with James suggested that James was not free to leave and/or was required to answer Officer English's questions. The fact that James got out of the police car and started heading back to the SUV after denying English's request for consent to a search of the car is clear evidence of that belief. As such, there was no Fourth Amendment violation because James was not "seized"

for purposes of the Fourth Amendment during the time Officer English asked questions and attempted to get his consent for a search of the car.

***2. Officer English developed reasonable, articulable suspicion to detain James before the tasks associated with the traffic stop were finished***

Even assuming the encounter with James after English issued the warning was nonconsensual, Officer English had reasonable suspicion to expand the scope of the encounter into an investigatory stop. James argues that Officer English's conduct—i.e., handing James the citation, shaking his hand, and suggesting that James was free to go—proves that, at 9 minutes into the traffic stop, nothing had occurred during the stop to generate reasonable suspicion to justify any further detention. However, to accept James's argument, this Court would have to ignore Officer English's credible testimony indicating that, within minutes of the initial encounter, several observations caused him to grow suspicious that criminal activity may be afoot. First, Officer English noticed James was traveling from a narcotics source city along a known drug trafficking corridor. Second, English noticed that the rental agreement was for a roundtrip rental and the SUV was due back in Phoenix on the day of the stop; yet James was stopped nearly one thousand miles away and heading eastbound—away from Phoenix. Officer English also grew suspicious because, on one hand, James shared specific details about his attempts to change the rental agreement from a roundtrip to a one-way rental but then was vague, evasive, and contradictory when asked about his travel plans including his destination and purpose. Officer English noted that James exhibited signs of both nervousness—forced yawning, grooming, or talking excessively, and evasiveness—by changing topics, overexplaining, and attempting to control the conversation.

In sum, considering Officer English's drug interdiction training and experience, his observations constitute reasonable, articulable suspicion that James was engaged in criminal

activity. That reasonable suspicion was sufficient to justify a brief detention of James to allow police to dispel or confirm that suspicion.

### C. Trick's Alert Provided Probable Cause to Search the SUV

Based on the factual findings, Officers English and Clement conducted a warrantless search of the SUV after Officer Clement's K-9 partner Trick alerted to the presence of drugs inside the SUV. Under the automobile exception to the warrant requirement, officers may, without violating the Fourth Amendment, "conduct a search, without a warrant, if they have probable cause to believe that evidence of a crime or contraband will be found inside." *United States v. Crawford,* 93 F.4th 436, 440 (8th Cir. 2024); *see also United States v. Pacheo,* 996 F.3d 508, 513 (8th Cir. 2021). "[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Crawford,* 93 F.4th at 440 (quoting *Illinois v. Gates*, 462 U.S. 213, 232 (1983)). Courts must consider all "the facts and circumstances known by the police when they began the search," or "the totality of the circumstances," and determine whether officers "of reasonable caution" could have inferred that the target vehicle would contain the evidence or contraband that officers sought. *Id.* (quoting *United States v. Caves*, 890 F.2d 87, 90 (8th Cir. 1989)). The Eighth Circuit has held "[a]ssuming that the dog is reliable, a dog sniff resulting in an alert on a container, car, or other item, standing alone, gives an officer probable cause to believe that there are drugs present. *United States v. Donnelly,* 475 F.3d 946, 954 (8th Cir. 2007).

Here, James does not dispute Officer Clement's testimony that within seconds of approaching the SUV, Trick positively alerted to the odor of narcotics. Instead, James argues the government failed to prove there was probable cause for the search because it failed to demonstrate that K-9 Trick had the requisite accuracy and reliability to support the finding of probable cause.

The Eighth Circuit has held that, in determining whether a dog is "reliable" courts should apply the framework the Supreme Court established in *Florida v. Harris,* 568 U.S. 237 (2013). *United States v. Perez,* 29 F.4th 975, 986 (8th Cir. 2022). Specifically, courts must ask, "whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime." *Perez,* 29 F.4th at 986 (quoting *United States v. Holleman,* 743 F.3d 1152, 1157 (8th Cir. 2014)). In applying this framework, the Eighth Circuit has held that "a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search" if a "bona fide organization has certified a dog after testing his reliability in a controlled setting." *Perez,* 29 F.4th at 986. Even in the absence of formal certification, a dog's alert may be presumed reliable "if the dog has recently and successfully completed a training program that evaluated his proficiency in locating drugs." *Id.* However, a dog's presumption of reliability "may be overcome if a defendant can show, either through cross-examination or introducing his own fact or expert witness, the inadequacy of a certification or training program or that the circumstances surrounding a canine alert undermined the case for probable cause." *Id.* (quoting *United States v. Gonzalez,* 781 F.3d 422, 429 (8th Cir. 2015)).

Officer Clement testified, without conflicting evidence offered by James, that at the time of the traffic stop, he had been a certified dog handler since 2020 and had worked with Trick for approximately a year and a half. He explained that the certification program required that the handler and the dog get certified, and annually recertified, as a "K-9 team" after hours of training. Officer Clement described the training required. Officer Clement's testimony both on direct and cross examination demonstrated that he and Trick were a certified K-9 team at the time of the traffic stop; that Trick was trained to detect cocaine, methamphetamine, heroin, and marijuana;

that he was unaware of any instance when Trick gave a false positive or false negative alert; and "[t]o the best of [his] knowledge, she's the best dog in the state."

Although James raised valid questions about the lack of details in Trick's training records, James did not present any evidence suggesting that the certifying agency referenced by Officer Clement was anything other than a bona fide certifying organization or that the certification or training programs described by Officer Clement were themselves inadequate. Nor did James present any evidence suggesting that the circumstances surrounding Trick's alert undermined the case for probable cause. The undersigned acknowledges the United States offered precious little in the way of documentation or details to support Officer Clement's testimony about the nature and scope of Trick's certification and training. However, nothing in Clement's testimony on cross examination or anywhere else in the record has caused the undersigned to question Clement's testimony that the K-9 team of Officers Clement and Trick had been tested, certified, and recertified annually by a state certifying agency; Trick was certified to detect narcotics; and at least to Officer Clement's knowledge, Trick was reliable and was "the best dog in the state."

The foregoing facts stand in stark contrast to the facts of *United States v. Davis,* Case No. 20-cr-209, 2022 WL 1410717 *1 (D. Minn. Apr. 15, 2022), on which James relies. Unlike this case, the record in *Davis* was rife with red flags about the reliability of the drug sniffing dog. Specifically, in concluding that the dog's alert did not support a finding of probable cause, the court in *Davis* held there were "additional on scene factors which would lessen the probability that a reasonably prudent person would think that a search of the [car . . .] would reveal contraband or evidence of a crime." *Id.* at *13. The court specifically pointed to evidence in the record that when the officer attempted to have the dog preform an exterior sniff of the car, the dog refused to comply and instead "bit on her leash, pulled her leash with her mouth, and

attempted to move away from the [car]." *Id.* The comments of the officer at the scene "increase[d] the negative effects of reliance on [the dog] because her refusal to comply was known by [her the officer]." *Id.* The officer in *Davis* was captured on camera explaining other situations in which the dog had refused to comply; the officer also stated the dog "shows up, doesn't wanna sniff. F****ng bites on him, runs around, and causes hell." *Id.* In addition to this on-scene conduct, the court in *Davis* found the dog was, in fact, not certified at the time of the sniff. *Id.*

In sum, James's challenge to the vehicle search fails because, based on the record before this court, the facts surrounding Trick's alert, when viewed through the lens of common sense, would make a reasonably prudent person think that a search of James's SUV would reveal contraband or evidence of a crime. *See Perez*, 29 F.4th at 986.

## II. Motion to Suppress Statements (ECF No. 21)

James argues the recorded statement he made while alone inside the police vehicle should be suppressed because it was obtained in violation of the Fifth and Fourth Amendment. ECF No. 21, at 2. Specifically, James asserts he was not clearly advised of his Fifth Amendment rights, and his statement was the result of his unlawful detention and arrest by police. *Id.* Based on the undersigned's review of the record, it does not appear that James made any incriminating statements in response to questions by police while in custody. At the evidentiary hearing, when the Court asked defense counsel to clarify which statement(s) James's motion seeks to suppress, defense counsel answered, "there is a video portion where Mr. James is in the back of Mr. English's patrol car and says something along the lines of "I'm effed" to himself while he's sitting there." *See* Tr. (ECF No. 87), at 132.

As the Eighth Circuit has held, "[t]he Fifth Amendment requires that *Miranda* warnings be given when a person is interrogated by law enforcement after being taken into custody." *United States v. Smialek,* 970 F.3d 1070, 1073 (8th Cir. 2020) (quoting *United States v. Giboney,* 863 F.3d 1022, 1027 (8th Cir., 2017)). "Voluntary statements unprompted by interrogation are admissible with or without *Miranda* warnings." *Id.* (quoting *United States v. Bailey*, 831 F.3d 1035, 1038 (8th Cir. 2016)). Under *Miranda*, "interrogation" refers to express questioning and its functional equivalent, *i.e.* "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id. (*quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)).

Based on the record before this Court, James's contested statement—which was made as he was sitting alone in the back of the police car—was clearly not made in response to police questioning. Because James's statement in the back of the police car was voluntarily made, there was no Fifth Amendment violation, and the statement can be used at trial even if police failed to give a *Miranda* warning. *See United States v. Lockett,* 393 F.3d 834 (8th Cir. 2005) (statements defendant made while seated in squad car were not made in response to police questioning, thus their admission at trial did not violate *Miranda*).

James contends suppression is also warranted because his statement was the result of his illegal detention and the illegal search of his rental car by police. As noted above, the exclusionary rule prohibits the use of evidence obtained in violation of the Fourth Amendment at trial to prove a defendant's guilt. *Elkins,* 364 U.S. at 223-24. The exclusionary rule applies to verbal statements obtained because of official misconduct as well as to the more traditional seizure of physical evidence. *Yousif,* 308 F.3d at 832 ("Verbal statements obtained as a result of a Fourth Amendment

violation are as much subject to the exclusionary rule as are items of physical evidence discovered during an illegal search.”). However, for the reasons discussed in the preceding section, James’s detention and the officers’ search of his rental car, which led to his arrest, did not violate the Fourth Amendment. As such, James’s motion to suppress his statement should be denied.

Accordingly, for the reasons stated in this Memorandum Opinion,

**IT IS HEREBY RECOMMENDED** that Defendant’s Motion to Suppress Evidence (ECF No. 20) be **DENIED**.

**IT IS FURTHER RECOMMENDED** that Defendant’s Motion to Suppress Statements (ECF No. 21) be **DENIED.**

The parties are advised that they have fourteen (14) days in which to file written objections to this report and recommendation pursuant to 28 U.S.C. §636(b)(1), unless an extension of time for good cause is obtained. Failure to timely file objections may result in a waiver of the right to appeal questions of fact. *See Thompson v. Nix,* 897 F.2d 356 (8th Cir. 1990).

Trial in this case will be conducted before the **Honorable Zachary M. Bluestone**. Judge Bluestone will schedule the trial by separate order at a later date.

Dated: November 23, 2026

SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE